[Cite as *State v. Gomez*, 2017-Ohio-8681.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2017-03-035 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 11/27/2017 |
| - vs - | | |
| | : | |
| MIGUEL LESTER GOMEZ, | : | |
| Defendant-Appellant. | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2016-06-0792


Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Christopher P. Frederick, 300 High Street, Suite 550, Hamilton, Ohio 45011, for defendant-appellant


**S. POWELL, J.**

{¶ 1} Defendant-appellant, Miguel Lester Gomez, appeals from the decision of the Butler County Court of Common Pleas denying his motion to suppress. Gomez was sentenced to serve eight years in prison after a jury found him guilty of one count of endangering children. For the reasons outlined below, we affirm.

{¶ 2} Gomez, who is originally from Guatemala, came to the United States when

he was approximately 19 years old. Gomez is now 30 years old, having lived and worked in the United States for over a decade. Being from Guatemala, Gomez's native language is Kaqchikel, a language that was also referred to during the proceedings as K'iche' or Qatzijob'al. Kaqchikel is a Mayan language spoken by the indigenous Kaqchikel people of central Guatemala.

{¶ 3} On July 6, 2016, the Butler County Grand Jury returned an indictment charging Gomez with one count of endangering children in violation of R.C. 2919.22(B)(1), a second-degree felony. The charge arose after Gomez admitted to Detectives Mark Henson and Mark Nichols of the Hamilton Police Department to violently shaking his infant daughter causing her to suffer multiple skull fractures, bleeding and swelling of the brain, as well as several fractured ribs. Gomez's confession occurred during an interview the detectives had with Gomez during the early morning hours of May 30, 2016. It is undisputed that the detectives' questioning of Gomez and Gomez's subsequent confession were video recorded. It is also undisputed that prior to this incident, Gomez had been in a four-year relationship with the child's biological mother, S.O., during which Gomez communicated with S.O. almost exclusively in Spanish. This communication included Gomez writing letters and text messages to S.O. in Spanish.

{¶ 4} On October 19, 2016, Gomez filed a motion to suppress the video recorded confession he made to the detectives. In support of this motion, Gomez alleged he was subject to a custodial interrogation by Detectives Henson and Nichols, during which he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. On November 8, 2016, the trial court held a hearing on Gomez's motion to suppress, wherein the trial court heard testimony from Detective Henson, S.O., and the English-to-Spanish interpreter provided to Gomez during the detectives' questioning.

{¶ 5} At the hearing, Detective Henson testified that he was called to the station

during the early morning hours of May 30, 2016 on reports that a child had suffered significant injuries and had to be airlifted from Cincinnati Children's Liberty Campus located in Liberty Township to one of Cincinnati Children's downtown Cincinnati campuses. After arriving at the station, Detective Henson met with Detective Nichols and another officer who informed him that "the parents [S.O. and Gomez] were willing to come into headquarters to talk with us. So the parents drove themselves into headquarters."

{¶ 6} Continuing, Detective Henson testified that once S.O. and Gomez arrived at the station on their own volition, he and Detective Nichols spoke with S.O. first, followed by S.O.'s two other children, ages seven and eight, respectively. After these interviews were complete, Detectives Henson and Nichols spoke with Gomez with the assistance of an English-to-Spanish interpreter. This interview began at approximately 2:30 a.m. Prior to speaking with Gomez, the video recording indicates Detective Henson informed Gomez of the following:

> You are not under arrest. You are not in custody. I appreciate that you have come here on your own. But you are in a building that is locked. And because of that I want to make sure that you understand that you can leave any time you want.

Detective Henson also testified that he told Gomez he "was free to leave at any time." The video recording of the interview corroborates Detective Henson's testimony. Gomez was then provided with a *Miranda* waiver card written in Spanish that Gomez signed after the interpreter read it to him in Spanish.

{¶ 7} After signing the *Miranda* waiver card, and upon confirming with Gomez that he understood his rights, Detectives Henson and Nichols questioned Gomez about the cause of his daughter's injuries, questioning that eventually led to Gomez confessing to violently shaking his infant daughter for approximately one minute after he became frustrated that the child would not stop crying. Gomez then twice demonstrated on a doll

how he shook his daughter, once with the interpreter present in the room and once without, causing the doll's head to forcefully swing back and forth. In attempting to explain his actions, Gomez told the detectives, "I was angry – my head – I lost my head." According to Detective Henson, when possible, Gomez responded to his questions in English and that those responses were appropriate to the questions asked.

{¶ 8} Following Detective Henson's testimony, S.O. testified she took her injured daughter, as well as Gomez and her two other children, to the Cincinnati Children's Liberty Campus during the late evening hours of May 29, 2016. Once there, S.O. testified she met with a police officer who asked her if she, Gomez, and her other two children would be willing to go to the Hamilton Police Department to answer a few questions about how her daughter was injured. Concerned about leaving her car behind at the hospital, S.O. testified that she drove to the station with Gomez and her two children while "one of the officers followed us." S.O. then testified that neither she nor Gomez were ever told that they were under arrest, only that they "were just going for questions."

{¶ 9} Finally, the English-to-Spanish interpreter testified. The interpreter, a certified interpreter with the Ohio Supreme Court, testified that she was asked by the Hamilton Police Department to assist Detectives Henson and Nichols in interviewing Gomez during the early morning hours of May 30, 2016. As part of these duties, the interpreter testified that she read the *Miranda* waiver card (written in Spanish) to Gomez in Spanish. The interpreter was then asked to translate the *Miranda* waiver card (written in Spanish) into English for the trial court, which she did and testified as follows:

> It says, "I," and then the Defendant wrote his name, "have been informed of my rights as they are written in this card and I wish to answer the questions without the presence of a lawyer." Date, May 30th, 2016. Time 2:34 a.m. Witness and a signature. Warning.
>
> "I am a police officer. I am informing you that you have the right

to keep silence [sic].  Everything that you say can and it will be used against you in a court of law.  You have the right to consult with a lawyer before and during any questioning, and to have a lawyer present while you're being questioned.

"If you cannot afford to pay for a lawyer, one will be assigned without a cost to you before we proceed with any interrogation.  During the interrogation, you can stop answering my questions, or the questions of any other officer, police officer, when you wish to do so.

"Did you understand the rights as I have read them to you?  After knowing your rights, do you wish to continue with me without the presence of a lawyer?  * * * "

{¶ 10} The interpreter was then asked if she recalled reading that specifically to Gomez, to which the interpreter responded "Yes, I do."  The interpreter also specifically testified that she asked Gomez if he understood Spanish, to which he responded "yes." The record indicates that Gomez never complained that he could not understand the interpreter.  In fact, just as Detective Henson had testified previously, the record indicates Gomez would oftentimes answer the detectives' questions in English before the interpreter had finished her Spanish translation.

{¶ 11} In addition to the testimony from Detective Henson, S.O., and the interpreter, as part of the evidence introduced by the state at the suppression hearing, the trial court viewed the video recording of the May 30 interview of Gomez by Detectives Henson and Nichols.  The testimony elicited from Detective Henson and the interpreter present during this interview is confirmed by the video recording, which this court has also viewed in its entirety.

{¶ 12} After both parties rested, the trial court issued its decision from the bench denying Gomez's motion to suppress.  In so holding, the trial court initially noted that Gomez had executed a written waiver of his *Miranda* rights, which created a strong presumption that his waiver was valid.  The trial court then stated:

> The Court has heard testimony today about the Defendant's ability to understand the Miranda rights as read to him. The Court notes that the Miranda rights were read to the Defendant in Spanish. And while the Defendant, there was testimony that the Defendant's first language is not Spanish or English, there was ample testimony that he speaks the Spanish language and some of the English language.

The trial court further stated:

> The Court notes that at no time during the interview that was conducted in Spanish and English did the Defendant indicate that he could not understand either the interpreter or the law enforcement officers. In fact, to the contrary, the Defendant would, when asked a question by the police officer, not hesitate to correct or clarify his answer even when it was contrary to the officer's question.
>
> The Court finds that the Defendant offered relevant and appropriate responses to the questions that were asked of him, and the Court knows that there were times when the Defendant answered in English the English question that was posed to him. And the Court also recollects the testimony of [the interpreter] where she indicated that sometimes the Defendant would answer in English before she had finished interpreting in Spanish.
>
> The Court finds that the interpreter took great lengths to make sure that the Defendant was able to understand what she was advising him. She stopped the interview to make sure that he understood what she [was] asking, and [the interpreter] indicated that when she could not understand the Defendant, it could be because of his accent, or because he was mumbling.

Concluding, the trial court again noted that the interpreter "directly asked the Defendant if he understood her Spanish, and he said yes" and that "the Defendant affirmatively waived his Miranda rights in writing after they were read to him in Spanish."

{¶ 13} After denying Gomez's motion to suppress, the matter proceeded to a three-day jury trial that ultimately concluded on January 11, 2017. Following deliberations, the jury returned a verdict finding Gomez guilty as charged. Thereafter, on March 8, 2017, the trial court sentenced Gomez to serve eight years in prison and imposed a mandatory period of three years of postrelease control.

{¶ 14} Gomez now appeals from the trial court's decision denying his motion to suppress, raising a single assignment of error for review.

{¶ 15} THE TRIAL COURT ERRED IN OVERRULING MR. GOMEZ'S MOTION TO SUPPRESS HIS STATEMENTS TO DETECTIVES WITH THE HAMILTON POLICE DEPARTMENT.

{¶ 16} In his single assignment of error, Gomez argues the trial court erred by denying his motion to suppress. We disagree.

### Standard of Review

{¶ 17} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8. In turn, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dugan*, 12th Dist. Butler No. CA2012-04-081, 2013-Ohio-447, ¶ 10. "'Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Runyon*, 12th Dist. Clermont No. CA2010-05-032, 2011-Ohio-263, ¶ 12, quoting *Burnside*.

### Custodial Interrogation

{¶ 18} Gomez initially argues that he was subject to custodial interrogation, thereby requiring the waiver of his *Miranda* rights to be knowingly, intelligently, and voluntarily made. It is well-established that the "'prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of

procedural safeguards effective to secure the privilege against self-incrimination.'" *State v. Huysman*, 12th Dist. Warren No. CA2005-09-107, 2006-Ohio-2245, ¶ 13, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). As a result, this necessarily begs the question of whether Gomez was, in fact, subject to a custodial interrogation. That is because "the duty to advise a suspect of constitutional rights pursuant to *Miranda* is only required when the police subject a person to custodial interrogation." *State v. Byrne*, 12th Dist. Butler Nos. CA2007-11-268 and CA2007-11-269, 2008-Ohio-4311, ¶ 10, citing *State v. Biros*, 78 Ohio St.3d 426, 440 (1997).

{¶ 19} "*Miranda* defines custodial interrogation as any 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *State v. Vansickle*, 12th Dist. Fayette No. CA2013-03-005, 2014-Ohio-1324, ¶ 54, quoting *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 10. "Encompassed in this definition are two distinct concepts: custody and interrogation." *State v. Staley*, 12th Dist. Madison No. CA99-08-019, 2000 Ohio App. LEXIS 1939, *8 (May 8, 2000). In this case, however, it is undisputed that Gomez was questioned by police regarding the significant injuries to his infant daughter, thereby subjecting him to an interrogation by the police. *See State v. Knuckles*, 65 Ohio St.3d 494 (1992), paragraph two of the syllabus ("when a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation"). The relevant issue, therefore, is whether Gomez was in custody at the time he was interrogated by the police.

{¶ 20} In determining whether an individual was in custody during an interrogation by the police, the court must examine the totality of the circumstances surrounding the interrogation. *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 12. As this court has stated previously, a person is in custody if he is formally placed under

arrest prior to a police interrogation, or, if not formally arrested, when there is a significant restraint on his freedom of movement. *State v. Smith*, 12th Dist. Fayette No. CA2006-08-030, 2009-Ohio-197, ¶ 11. This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Henry*, 12th Dist. Preble No. CA2008-04-006, 2009-Ohio-434, ¶ 13. Therefore, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).

{¶ 21} Gomez claims he was subject to a custodial interrogation by the police since he was "escorted" to the police station by a police cruiser for questioning, where, upon his arrival with S.O. and her two children, he was immediately separated from S.O. and placed in a "small locked room for approximately an hour before his interrogation started." However, while this may very well be true, Gomez conveniently ignores the fact that he went to the station for questioning voluntarily and that Detective Henson specifically told him prior to the start of the interview that he was not under arrest, that he was not in custody, and that he could leave at any time he wanted. The record makes it clear that Gomez never once asked to leave the interview in question after arriving at the police station voluntarily.

{¶ 22} "[A] person is not in custody merely because he is questioned at the police station or because he is considered a suspect." *State v. Smith*, 12th Dist. Fayette No. CA2006-08-030, 2009-Ohio-197, ¶ 12. In fact, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect, is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Huysman*, 2006-Ohio-2245 at ¶ 16, quoting *Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526 (1994). Moreover, the fact that a police cruiser followed S.O.'s car as she drove

to the police station is of little significance considering it is well-established that a person is not in custody even where "they are transported to the police station by a police officer." *Smith*, 2009-Ohio-197 at ¶ 12, citing *State v. Warren*, 2d Dist. Montgomery No. 15202, 1996 Ohio App. LEXIS 4648 (Jan. 20, 2009). This is especially true when the person being questioned is free to leave at any time, as was Gomez. Therefore, although Gomez was advised of his *Miranda* rights, because Gomez was not subject to a custodial interrogation by Detectives Henson and Nichols, neither *Miranda* warnings nor a waiver of those rights were required for Gomez's confession to be admissible. Again, "*Miranda* warnings are not required simply because questioning takes place in a courthouse or police station." *State v. Tate*, 7th Dist. Mahoning No. 07 MA 130, 2008-Ohio-3245, ¶ 44. Accordingly, Gomez's first argument is without merit.

**Knowing, Intelligent, and Voluntary Waiver of *Miranda* Rights**

{¶ 23} Even assuming Gomez was subject to a custodial interrogation by the police, which we have determined he was not, the record nevertheless firmly establishes that Gomez was properly advised of his *Miranda* rights and that he knowingly, intelligently, and voluntarily waived those rights.

{¶ 24} "A suspect may waive his *Miranda* rights provided his waiver is knowing, intelligent and voluntary." *State v. Linnik*, 12th Dist. Madison No. CA2004-06-015, 2006-Ohio-880, ¶ 11, citing *Edwards v. Arizona*, 451 U.S. 477, 483, 101 S.Ct. 1880 (1981). To determine whether a valid waiver occurred, we "'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus. In considering whether a waiver is involuntary, the Ohio Supreme Court

has held that "a waiver is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *Wesson*, citing *State v. Cooey*, 46 Ohio St.3d 20, 28 (1989). The burden is upon the state to prove a knowing, intelligent, and voluntary waiver of *Miranda* by a preponderance of the evidence. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, ¶ 107.

{¶ 25} As noted above, in ruling on Gomez's motion to suppress, the trial court stated:

> The Court has heard testimony today about the Defendant's ability to understand the Miranda rights as read to him. The Court notes that the Miranda rights were read to the Defendant in Spanish. And while the Defendant, there was testimony that the Defendant's first language is not Spanish or English, there was ample testimony that he speaks the Spanish language and some of the English language.

The trial court also stated:

> [T]he interpreter] directly asked the Defendant if he understood her Spanish, and he said yes. Likewise, the Defendant affirmatively waived his Miranda rights in writing after they were read to him in Spanish.

{¶ 26} After a thorough review of the record, we find no error in the trial court's decision finding Gomez was properly advised of his *Miranda* rights and that he knowingly, intelligently, and voluntarily waived those rights. The fact that his native language is Kaqchikel, as opposed to either Spanish or English, is immaterial when considering the overwhelming evidence that he communicated with S.O., his then girlfriend, almost exclusively in Spanish during their four-year relationship. This included evidence that Gomez sent S.O. letters and text messages in Spanish. The video recording of the interview further supports the trial court's decision finding Gomez understood the *Miranda* rights read to him in Spanish before signing a *Miranda* waiver card written in Spanish. Again, when directly asked if he understood the interpreter's Spanish provided to him during

this interview, Gomez specifically stated that he could. Therefore, finding no error in the trial court's decision finding Gomez was properly advised of his *Miranda* rights and that he knowingly, intelligently, and voluntarily waived those rights, Gomez's second argument is likewise without merit.

{¶ 27} In light of the foregoing, finding no merit to either of Gomez's arguments raised herein, we find no error in the trial court's decision denying Gomez's motion to suppress. Accordingly, Gomez's single assignment of error is without merit and overruled.

{¶ 28} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.