[Cite as *State v. Schaaf*, 2019-Ohio-196.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2018-03-004 |
| | : | O P I N I O N |
| - vs - | | 1/22/2019 |
| | : | |
| GABRIEL R. SCHAAF, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 17-CR-12359


Martin P. Votel, Preble County Prosecuting Attorney, Preble County Courthouse, 101 East Main Street, Eaton, Ohio 45320, for appellee

Nicole L. Rutter-Hirth, 2541 Shiloh Springs Road, Dayton, Ohio 45426, for appellant


**RINGLAND, J.**

{¶ 1} Gabriel Schaaf appeals from his convictions in the Preble County Court of Common Pleas for aggravated murder, murder, and tampering with evidence. For the reasons discussed below, this court affirms Schaaf's convictions.

{¶ 2} At approximately 5:45 p.m. on December 27, 2016, Schaaf called 9-1-1 and reported that he had arrived home from work to find his son – 29 year-old Jonathan Schaaf – dead in their home. Police arrived on scene and found Jonathan deceased and covered with

a towel. He was face down with his head in a pool of blood. He had suffered multiple sharp and blunt force injuries to the head, back of his neck, and upper back.

{¶ 3} Schaaf denied involvement in Jonathon's death. He told police that Jonathon was asleep on the couch when he left for work that morning. When he returned he found a door ajar and noticed some items out of place. Schaaf provided the investigating detectives with potential leads on various individuals who may have wanted to harm his son.

{¶ 4} Police considered Schaaf the primary suspect in Jonathon's death. Nonetheless, they investigated Schaaf's leads over the next six months, none of which resulted in any furtherance of the investigation. In February 2017, detectives called Schaaf and left him a message asking if he would speak with them about the case. Schaaf returned the call, leaving a voicemail stating that he spoke to an attorney who told him not to talk to the detectives. Oddly, Schaaf ended the message by telling police they could call him, or his attorney, if they had any questions.

{¶ 5} Several months later, detectives again called Schaaf and asked if he would speak with them concerning the death investigation. Schaaf told detectives if they wanted to talk they would need to come to him.

{¶ 6} On June 8, 2017, detectives travelled to Schaaf's home. There they observed Schaaf cutting his grass on a riding lawn mower. The detectives then interviewed Schaaf for approximately one hour while he sat on the lawn mower. Detectives recorded the interview in an audio format.

{¶ 7} The detectives confronted Schaaf with inconsistencies in his earlier statements and the evidence revealed in the investigation. They urged Schaaf to admit his involvement in Jonathon's homicide and suggested that the homicide could be justified if done in self-defense. About 25 minutes into the interview, Schaaf revealed that he had been in a physical altercation with Jonathon on December 26, 2016. In addition, Schaaf admitted that

he struck Jonathon several times with a hatchet.

{¶ 8} The detectives placed Schaaf under arrest and transported him to the police station. Schaaf executed a written waiver of his *Miranda* rights at the station before submitting to a second interview, which was recorded in video format.

{¶ 9} A grand jury subsequently indicted Schaaf for tampering with evidence, a violation of R.C. 2921.12(A)(1), murder, a violation of R.C. 2903.02(A), and aggravated murder, a violation of R.C. 2903.01(A).

{¶ 10} The matter proceeded to a jury trial. The state introduced the testimony of the detectives and a coroner. The state also introduced audio and video recordings of Schaaf's statements including his initial 9-1-1 call, an interview with a responding police officer at the crime scene, the "lawn mower" interview, and the post-arrest interview at the police station. Schaaf rested without introducing evidence but argued self-defense in closing. The court instructed the jury on self-defense.

{¶ 11} The jury returned guilty verdicts on all three counts. The court sentenced Schaaf to 25 years to life in prison. Schaaf raises three assignments of error in this appeal.

{¶ 12} Assignment of Error No. 1:

{¶ 13} SCHAAF WAS DEPRIVED OF A FAIR TRIAL DUE TO THE PROSECUTION COMMENTING ON SCHAAF INVOKING HIS RIGHT TO REMAIN SILENT AND RIGHT TO COUNSEL.

{¶ 14} Schaaf argues that the state deprived him of a fair trial when the prosecutor, during voir dire, stated that there would be no trial if there was no dispute as to what occurred between Schaaf and Jonathon. Schaaf also argues that the state deprived him of a fair trial when a detective testified that Schaaf told the police he would not speak to them on the advice of counsel. Schaaf concedes that he did not object to either claimed instance of error and is limited to a review for plain error.

{¶ 15} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436 (1997). This court should notice plain error with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice. *State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 84.

{¶ 16} To demonstrate that the state deprived him of a fair trial, Schaaf must demonstrate that the prosecutor's comments or actions were improper and prejudicially affected his substantial rights. *See State v. Elmore*, 111 Ohio St. 3d 515, 2006-Ohio-6207, ¶ 62. In making such a determination, the focus is upon the fairness of the trial, not upon the culpability of the prosecutor. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. A finding of prosecutorial misconduct will not be grounds for reversal unless the defendant can establish that he has been denied a fair trial because of the prosecutor's actions. *See State v. Smith*, 12th Dist. Warren No. CA2017-02-013, 2017-Ohio-7540, ¶ 29. During voir dire, the prosecutor stated:

> Does everyone understand that if everyone in this room agreed about what happened on December 26th, 2016, there wouldn't be a need for a trial? In other words, there likely will be a conflict of evidence in this case. Is there anyone who doesn't understand that?
>
> And is there anyone who for any reason does not feel that they could be part of that function of a trier of fact and separate what they think the truth is and what they think the lies are and reach a fair and impartial verdict?

{¶ 17} These statements were appropriate and accurately relayed to jurors that facts

are contested in every trial. The remarks appeared designed to prepare jurors for the unique task of resolving conflicts in evidence in rendering a verdict. The questions posed by the prosecutor were neutrally phrased and did not insinuate that only a guilty or dishonest individual would seek a trial.

{¶ 18} Next, Schaaf argues that the prosecutor committed misconduct by eliciting testimony from a detective concerning Schaaf's right to remain silent. During direct examination, the prosecutor asked the detective what the status of the police investigation was prior to Schaaf's admission to involvement in the homicide. The detective's response explained the various reasons why law enforcement focused its effort on Schaaf as the primary suspect. Those reasons included that the killer had draped a towel over the body, indicating a personal relationship with Jonathon, that the blood on scene appeared coagulated and inconsistent with Schaaf's timeline, Schaaf's demeanor, his failure to contact law enforcement for updates on the investigation for over two weeks following the death, and Schaaf's cancellation of a police interview. With respect to this cancellation, the detective stated that Schaaf called and left a voice message stating that he had talked to his attorney, who advised him not to speak to the police.

{¶ 19} The use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination. *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, syllabus. In *Leach*, the Ohio Supreme Court held, in limited circumstances, testimony concerning pre-arrest silence is appropriate if it is introduced as evidence of the "course of the investigation." *Id.* at ¶ 32. The court concluded that while it was improper to admit the investigator's direct testimony regarding the defendant's decision to exercise his right to silence through the invocation of counsel over the telephone, the investigator's testimony regarding the defendant's failure to keep his scheduled appointment with the police was "legitimate." *Id.*

{¶ 20} In this case, detective's testimony on direct examination concerning Schaaf cancelling an appointment based on his attorney's advice not to speak with police was the state's use of pre-arrest silence as substantive evidence of appellant's guilt and was error.[1] However, assuming a Fifth Amendment violation occurred, this court would not find that Schaaf was deprived of a fair trial. As will be addressed below, the murder verdicts were supported by substantial evidence of Schaaf's guilt. *Compare Leach* at ¶ 29 (noting that the defendant was convicted on no physical evidence and only on the credibility of the state's complaining witnesses). Moreover, any error would be harmless because jurors were aware that Schaaf later voluntarily agreed to speak with police and provided them with his version of events wherein he set forth his claim of self-defense. This court overrules Schaaf's first assignment of error.

{¶ 21} Assignment of Error No. 2:

{¶ 22} THE TRIAL COURT ERRED IN OVERRULING SCHAAF'S MOTION TO SUPPRESS AND ALLOWING INCULPATORY STATEMENTS TO BE ADMITTED DESPITE SCHAAF INVOKING HIS RIGHT TO COUNSEL AND NOT BEING ADMINISTERED MIRANDA WARNINGS.

{¶ 23} Schaaf argues that the trial court should have suppressed both the "lawn mower" interview and his subsequent interview at the police station. Schaaf contends that police should not have questioned him during the lawn mower interview without first advising him of his *Miranda* rights because he was in "custody" during the interview as police were "badgering" him during questioning. Schaaf also contends that police should not have questioned him at all because he had earlier invoked his right to remain silent. Schaaf argues that his statements during the interview at the police station are fruit of the poisonous

---

1. To be clear, there is no indication that the prosecutor intended to elicit this testimony. The detective provided a lengthy response to a general question.

tree.

{¶ 24} This court's review of a trial court's denial of a motion to suppress evidence presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Id.* at ¶ 12.

{¶ 25} The state may not use a defendant's statements, whether exculpatory or inculpatory, stemming from custodial interrogation, unless the state demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶ 15. However, the police are not required to administer the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), to every individual they question. *State v. Byrne*, 12th Dist. Butler Nos. CA2007-11-268 and CA2007-11-269, 2008-Ohio-4311, ¶ 10, citing *Biros*, 78 Ohio St.3d at 440; *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711 (1977). Rather, the "duty to advise a suspect of constitutional rights pursuant to *Miranda* is only required when the police subject a person to a custodial interrogation." *State v. Fridley*, 12th Dist. Clermont No. CA2016-05-030, 2017-Ohio-4368, ¶ 35.

{¶ 26} "*Miranda* defines custodial interrogation as any 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of any action in any significant way.'" (Emphasis deleted.) *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 10, quoting *Miranda*, 384 U.S. at 444.

"In determining whether an individual was in custody during an interrogation by the police, the court must examine the totality of the circumstances surrounding the interrogation." *State v. Gomez*, 12th Dist. Butler No. CA2017-03-035, 2017-Ohio-8681, ¶ 20, citing *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 12. The determination of whether a custodial interrogation has occurred "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Coleman*, 12th Dist. Butler No. CA2001-10-241, 2002 Ohio App. LEXIS 1985, *11-12 (Apr. 29. 2002), citing *Stansbury v. California*, 511 U.S. 318, 323-324, 114 S.Ct. 1526 (1994). Therefore, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).

{¶ 27} At the suppression hearing, a detective testified that he and his partner drove to Schaaf's home in an unmarked police vehicle. Both detectives wore plain clothes with tactical vests. They observed Schaaf in his yard cutting the grass on a riding lawn mower.

{¶ 28} The detectives motioned for Schaaf to come over to them. Schaaf did not immediately drive over but made a few more passes with the mower. Eventually, he drove over to the detectives, turned the mower engine off, and sat on it while they asked him questions.

{¶ 29} The detectives stood about 15 feet from Schaaf while questioning him. The interview lasted around 50 minutes. Audio of the interview demonstrates that the detectives did not threaten Schaaf nor did Schaaf sound confused or disoriented. Schaaf was not placed into handcuffs until the interview was complete and after he had made inculpatory statements.

{¶ 30} This court finds that the trial court's determination that Schaaf was not in police custody during the lawn mower interview was supported by competent and credible evidence. Consequently, this court finds that police were not required to provide Schaaf with *Miranda* warnings before the lawn mower interview commenced. Schaaf's statements were voluntary and admissible.

{¶ 31} Next, Schaaf argues that the detectives should not have conducted the lawn mower interview because he had earlier invoked his right to counsel. The United States Supreme Court has held that "[a]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. at 484-485. However, the *Edwards* rule applies only if the accused invokes his right to an attorney *while in custody*. *Coleman*, 2002 Ohio App. LEXIS 1985 at *10, citing *United States v. Harris*, 961 F. Supp. 1127, 1135 (S.D. Ohio 1997).

{¶ 32} Schaaf was not in police custody in February 2017 when he informed detectives by phone that he had been advised against speaking to them by an attorney. For the reasons just discussed, Schaaf was also not in police custody during the lawn mower interview. Accordingly, Schaaf had no Fifth Amendment right to counsel during the lawn mower interview that the detectives could have violated by questioning him. Schaaf was free to ignore the advice of his attorney and speak to police. Based on the foregoing, the trial court also did not err in overruling Schaaf's motion to suppress his statements at the police station. Consequently, this court overrules Schaaf's second assignment of error.

{¶ 33} Assignment of Error No. 3:

{¶ 34} THE EVIDENCE DID NOT SUPPORT A CONVICTION FOR AGGRAVATED MURDER.

{¶ 35} Schaaf argues that his convictions for murder and aggravated murder were supported by insufficient evidence and were against the manifest weight of the evidence. The concept of legal sufficiency of the evidence refers to whether the conviction can be supported as a matter of law. *State v. Everitt*, 12th Dist. Warren No. CA2002-07-070, 2003-Ohio-2554, ¶ 10. In reviewing the sufficiency of the evidence, an appellate court must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact would have found all the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 36} To determine whether a conviction is against the manifest weight of the evidence, a reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 17. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18.

{¶ 37} The aggravated murder count required the state to prove that Schaaf purposely caused Jonathon's death "with prior calculation and design." R.C. 2903.01(A). Schaaf argues that there was insufficient evidence to support this element because there was no evidence that he planned Jonathon's homicide. Instead, the evidence reflected a mutual combat between father and son which culminated in Schaaf delivering fatal blows in self-

defense.

**{¶ 38}** There is no bright-line test to determine whether prior calculation and design are present; each case must be decided on a case-by-case basis. *State v. Adams*, 12th Dist. Butler No. CA2009-11-293, 2011-Ohio-536, ¶ 23.

> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, ¶ 61.

**{¶ 39}** The Ohio Supreme Court has held that the state provided sufficient evidence of prior calculation and design where, during a robbery, the defendant placed a gun to the forehead of a cooperative and unresisting store clerk, who was standing with his hands above his head, and pulled the trigger, instantly killing the clerk. *State v. Goodwin*, 84 Ohio St.3d 331, 344 (1999). Following the murder, the defendant did not flee the store. Instead, the defendant then placed the gun to the forehead of another store clerk and ordered him to go to the store safe. *Id.*

**{¶ 40}** The court explained that the defendant's decision to place a gun against the victim's forehead required thought. That the defendant took some additional time to decide to pull the trigger showed calculation. The court held that these facts, coupled with the defendant's actions following the killing, demonstrated that the murder was in furtherance of the defendant's robbery scheme and was not a spur-of-the-moment accidental shooting. *Id.*

**{¶ 41}** The Ohio Supreme Court also found prior calculation and design where the defendant was a participant in a planned robbery at an apartment. *State v. Jackson*, 92 Ohio St.3d 436 (2001). During the robbery, the defendant struck a victim with a handgun, placed a pillow behind her head and threatened to kill her. *Id.* at 436. The victim begged to be

spared, and the defendant did not kill her. Next, the defendant ordered two other victims to lie on the floor next to one another. The defendant then told his accomplice that these prone victims knew who he was, and he would have to kill them. *Id.* One at a time, the defendant placed a pillow against the head of the victims, hesitated, then pulled the trigger, killing both. *Id.* at 436-437.

{¶ 42} The court noted that the defendant's actions again did not demonstrate a spur-of-the-moment decision to kill. Instead, the evidence indicated that the defendant decided to kill the defendants execution-style after he realized they recognized him, and the defendant took time to retrieve a pillow from the couch to effectuate his calculated plan. *Id.* at 442.

{¶ 43} Schaaf's recorded statements to police establish that he struck Jonathon several times on the head with a door dowel. This action rendered Jonathon unconscious, breathing, and face down on the ground. Schaaf was aware that Jonathon was still alive but also knew that he was "not okay." Schaaf then retrieved a hatchet. He next swung the hatchet multiple times at the back of Jonathon's neck and shoulders. The coroner's testimony and photographs introduced into evidence graphically demonstrated that the blows were delivered with such force that Jonathon was essentially decapitated. Schaaf admitted in his interview at the police station that his purpose in using the hatchet was to make sure that Jonathon was "finished off," ostensibly so that "he wouldn't suffer."

{¶ 44} This court concludes that the evidence in this case, when viewed in a light most favorable to the prosecution, was sufficient to allow the jury to find prior calculation and design. Reasonable jurors could find that Schaaf had time and opportunity to plan Jonathon's homicide between rendering him unconscious with the dowel and the ultimate act of killing. This is demonstrated by Schaaf observing Jonathon's failing medical state following the dowel attack, his subsequent retrieval of a specific weapon, and the decision to employ massive force and repeated blows to ensure that Jonathon was, in Schaaf's words,

"finished off." Schaaf's description of using the hatchet for the alleged reason of ending Jonathon's suffering does not indicate a spur-of-the-moment killing during a mutual combat scenario but rather a calculated choice.

{¶ 45} Next, Schaaf argues that the jurors lost their way in finding that he did not act in self-defense. Self-defense, in a deadly force scenario, is an affirmative defense that requires a defendant to prove three elements by a preponderance of the evidence: "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Goff*, 128 Ohio St.3d 169, 176, 2010-Ohio-6317, ¶ 36, citing *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997).

{¶ 46} Upon review, this court does not find that the jury lost its way in finding that Schaaf did not meet his burden on self-defense. Schaaf did not testify or otherwise present any evidence. But a self-defense case was nonetheless presented to jurors through the lawn mower interview and his subsequent statements at the police station. Jurors were free to find Schaaf not credible for a variety of reasons, including the absence of any self-defense type injuries on his body, his failure to contact police immediately after the homicide, his casual demeanor contacting 9-1-1 and speaking to a first-responding officer after reporting his son's death, and his deliberate deception during the ensuing police investigation. Consequently, Schaaf's murder convictions were supported by sufficient evidence and were not against the manifest weight of the evidence and this court overrules the third assignment of error.

{¶ 47} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.